## AFFIDAVIT IN SUPPORT OF APPLICATION FOR ISSUANCE OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Joshua Brenner, being duly sworn, depose and state that:

**I.  Introduction and Agent Background.**

1. I am a Special Agent with United States Agency for International Development ("USAID"), Office of the Inspector General ("OIG"). During the course of my career, I have conducted numerous fraud investigations around the world and in the United States. In the course of conducting or participating in criminal investigations, I have been involved in interviewing and debriefing witnesses and informants; conducting physical surveillance; analyzing bank records and other financial documents; analyzing telephone records; collecting and analyzing evidence; and preparing and executing search warrants.

2. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I also have received information from other law enforcement officers relating to this investigation. The information set forth in this affidavit is based on my own observations and review of documents, or reliable information provided to me by other law enforcement personnel. I make this affidavit based upon personal knowledge derived from my participation in this investigation, upon my experience as an agent, and upon information I believe to be reliable from sources including, among others, the following: (a) oral and written reports about this and other investigations that I have either written or received from employees of the USAID OIG, other law enforcement agencies, and financial institutions; (b) physical surveillance in which I have personally participated or that has been reported to me; (c) public records; (d) records obtained by grand jury subpoena; (e) interviews of witnesses; and (f) records obtained from federal departments and agencies.

1

3. Since this affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint and the issuance of an arrest warrant, I have not included each and every fact known to me or the other investigators about this investigation. Rather, I have set forth only those facts that are necessary to establish probable cause that Eugene S[redacted] Sickle (M.D.) (hereinafter known as "Sickle") committed the following offense in the District of Columbia, on January 27, 2016: 18 U.S.C. § 1956(a)(1)(B)(i) – concealment money laundering (the "Subject Offense").

## II. Investigative Background.

4. USAID is the lead U.S. Government agency that works to end extreme global poverty and enable resilient, democratic societies to realize their potential. It has regional offices around the world for which it sets annual budgets. Those funds are held and/or controlled in the District of Columbia by the Treasury Department, and regional USAID offices access the funds to support local initiatives. USAID/South Africa is a regional office that works with local organizations in South Africa to implement programs and achieve USAID's goals

5. In 2012, USAID/South Africa awarded Wits Reproductive Health and HIV Institute (WRHI) three cooperative agreements, worth a total combined sum of $76,944,764. These cooperative agreements were supposed to: (1) support the Systems Strengthening for Better HIV/TB Patient Outcomes (AID-674-A-12-00021), with a total estimated amount of $51,387,919; (2) provide support for the HIV Innovations for Improved Patient Outcomes for Priority Populations (AID -674-A-12 -00032), with a total estimated amount of $13,506,985; and (3) support the South African Government to develop, implement, and evaluate a National Sex Worker and Male Client Plan (AID- 674-A-12-00034), with a total estimated amount of $12,049,860.

2

Sickle, as the Deputy Executive Director of WRHI, managed all three cooperative agreements from their inception.

6. On October 2, 2015, WRHI entered into a contract with Alzar Consulting Services (Alzar) for $283,500 for the development and implementation of a safe delivery (childbirth) mobile electronic device software application (the "Childbirth App") in conjunction with the South African National Department of Health. USAID is the funder of the sub-agreement between WRHI and Alzar. The WRHI Chief Executive Officer, and Sickle, signed the Alzar contract on behalf of WRHI. The contract was also signed in the name of Doctor Carla Das Neves on Alzar's behalf, purportedly as its Director.

7. On September 30, 2015 Alzar sent an invoice of $113,400 to WRHI, for contractual services, tranche payment one, upon contract signature.

8. On November 2, 2015, Wits Health Consortium (WHC) made the first payment to Alzar for $113,400. WRHI is a division of WHC and all payments owed by WRHI are processed through WHC. The payment was made with a wire transfer from WHC's First Rand Bank account into Alzar's AfrAsia Bank LTD account ("Alzar's AfrAsia Account"), which is in the Republic of Mauritius.

9. On December 04, 2015, Alzar emailed WRHI the second invoice. The invoice was for contractual services for the Childbirth App as per the agreement.

10. On January 6, 2016, WHC made a second payment to Alzar for $92,850, to the same bank account as the first transaction.

11. Sickle approved both payments to Alzar. He was one of only two individuals with an authorized bank mandated signature for WRHI.

12. In May 2016, Sickle suddenly resigned from his position at WRHI after he was confronted about creating a false document allegedly submitted to WRHI by a third party. The document that caused Sickle to resign is not directly a part of the fraud that is the subject of the Complaint to which this Affidavit relates. Its discovery, however, along with Sickle's abrupt resignation, caused USAID and WRHI to investigate Sickle's management of WRHI.

13. According to an interview of the WRHI Grants Manager, Alzar never produced the Childbirth App as it was contracted to develop for WRHI. Consequently, WRHI did not make the third and final payment of $77,250 potentially owed under the contract with Alzar. WRHI also attempted to contact Alzar by sending an email to its purported Director, Doctor Carla Das Neves, at the email address ██████@alzarconsulting.com. In that email, WRHI asked Alzar to produce reports that were contractually required, but that remained outstanding for the two payments made to Alzar. The Das Neves email was returned as undeliverable. Shortly thereafter, WRHI received an email from Michael Carvello, Alzar's ostensible Chief Accounting Officer, who promised to provide the missing reports. WRHI never received any reports from Alzar and its subsequent attempts to contact the company went unanswered. The WRHI Chief Operating Officer stated that Alzar never produced any reports nor have they produced the Childbirth App.

14. WRHI undertook a forensic review of Sickle's work computers following his resignation. WRHI confirmed that the computer devices belonged to Sickle and were used by him. A template for the $113,400 Alzar invoice to WRHI was on one of Sickle's computers. The invoice template was blank under the section "description" and in another section instructed the user to "Insert Your Logo" on the upper left corner. The draft invoice was dated September 25, 2015. The forensic review also uncovered a copy of the final invoice that was emailed to WRHI

for $113,400, and it was dated September 30, 2015. The second invoice was purportedly emailed to WRHI by Carvello from the email address ▆▆▆▆@alzarconsulting.com. The OIG compared the draft invoice and the final invoice which were found on Sickle's computer to the final invoice sent by Alzar and the documents matched. The OIG also found two draft contracts with WRHI and Alzar on Sickle's computers. The Alzar and WRHI draft contract metadata showed that Sickle was the author of the document and was last revised by him on September 22, 2015. The OIG compared the draft contract found on Sickle's computer to the final contract signed by WRHI and Alzar and the documents matched.

15. The OIG found Alzar's company registration documents on Sickle's computers, which show that Sickle formed and was the owner of Alzar. Sickle's ownership interest in Alzar was never disclosed to WRHI. An invoice and bank document shows that Sickle used his personal Bank of America account ▆▆▆▆8955, "Sickle's BOA Account") to wire $3,490 to Fidelity Corporate Services (Fidelity) on June 15, 2015, to officially register Alzar as a business. Among the services listed as being provided by Fidelity were the creation of company formation and primary documents, government license fee, and registered agent services. An internet online search for information about Fidelity further revealed that its main function is offshore company formation in the British Virgin Islands and subsequent management and administration of such companies, including services of the Registered Agent, provision of the registered address, third-party directorship, and company management services. Sickle's work computers also contained a copy of a Company Formation and Management Agreement between Sickle and Fidelity, which listed Sickle as the "100%" owner of Alzar, a registered British Virgin Islands entity. The Alzar Management Agreement dated March 16, 2015, sets forth Sickle's email address as

▓▓▓▓@gmail.com. It states that Alzar's primary purpose is to "provide technical consulting services to the health and development sectors" in Southern and Eastern Africa, South America and Europe.

16.   Your affiant has reviewed bank records from Sickle's BOA Account. This account was opened in the name of Eugene ▓▓▓▓ Sickle, with an address of ▓▓▓▓ Boston, MA 02115-1602, while Sickle was attending school in the Boston area. The records confirm that between November 6, 2015 and April 4, 2016, this account received six wire transfers from Alzar's AfrAsia Account totaling $55,436. The account activity was as follows:

17.   On November 6, 2015, Alzar wired $9,850 from its AfrAsia Account to Sickle's BOA Account. These funds moved through a Citibank intermediary account before reaching Sickle's BOA Account. Within roughly three hours of receiving the $9,850 wire payment into Sickle's BOA Account, Sickle made three wire payments in the amount of $1,000, $1,000, and $950, respectively, from Sickle's BOA Account to other accounts. The $950 wire was sent to Sickle's Investec Bank account in South Africa.

18.   On November 12, 2015, Alzar wired $8,788 from its AfrAsia Account to Sickle's BOA Account. These funds moved through a Citibank intermediary account before reaching Sickle's BOA Account. On November 16, 2016, Sickle sent a $1,000 wire to his Investec Bank account in South Africa.

19.   On November 24, 2015, Alzar wired $8,850 from its AfrAsia Account to Sickle's BOA Account. These funds moved through a Citibank intermediary account before reaching Sickle's BOA Account.

20.    On December 17, 2015, Alzar wired $8,850 from its AfrAsia Account to Sickle's BOA Account. These funds moved through a Citibank intermediary account before reaching Sickle's BOA Account.

21.    On January 25, 2016, Alzar wired $9,850 from its AfrAsia Account to Sickle's BOA Account. Prior to this transfer, Sickle's BOA Account had a balance of about $740. On January 26, 2016, Sickle arrived in the United States at Dulles Airport in Virginia. He was traveling from Ghana, Africa. On his I-94 United States Customs arrival form submitted on January 26, 2016, Sickle listed the location he was staying while in the United States as "M Street, Washington, D.C." On January 27, 2016, Sickle made two $500 cash withdrawals from two Bank of America ATMs, both located in Washington, D.C. Sickle's BOA Account records show that on January 27, 2016 Sickle made an $8,500 wire transfer from Sickle's BOA Account to his personal account at Investec Bank in South Africa. On January 28, 2016, Sickle made another $500 cash withdrawal from Sickle's BOA Account at a Bank of America ATM located in Washington, D.C. In addition, seven debit or check card purchases dated between January 27 and January 29, 2016 appear on Sickle's BOA Account records, all of which took place in Washington, D.C. No other transactions, including purchases or withdrawals, appear on Sickle's BOA Account records on those dates – all of Sickle's BOA Account transactions on those dates took place in Washington, D.C. Sickle departed the United States on January 29, 2016, leaving Dulles Airport for Senegal, Africa. From January 25 to January 29, 2016, Sickle's BOA Account received no deposits or credits other than the $9,850 wire from Alzar. The Alzar funds moved through a Citibank intermediary account before reaching Sickle's BOA Account.

22. On April 4, 2016, Alzar wired $9,248 from its AfrAsia Account to Sickle's BOA Account. These funds moved through a Citibank intermediary account before reaching Sickle's BOA Account.

23. Overall, your affiant believes that Sickle's use of a shell corporation account to receive the proceeds of the fraud, and his rapid disbursement of these fraudulently obtained proceeds via cash withdrawals and wire transfers to offshore bank accounts are all indicative of an intent to conceal or disguise the nature, source, ownership and control of the illegal fraud proceeds.

### III. Location of Sickle.

24. On January 17, 2017, Sickle arrived at Washington Dulles international airport and took a connecting flight to Juarez international airport, Mexico. On February 07, 2017, Sickle is scheduled to return to Washington Dulles and take a connecting flight to South Africa on February 9, 2017.

### IV. Conclusion.

25. Based upon the information set forth above, there is probable cause to believe that Sickle is engaging in the Subject Offense. I therefore request the issuance of a warrant to arrest Dr. Eugene Stanford Sickle based upon probable cause that he committed the offenses outlined above and in the attached criminal complaint.

26. Your affiant further requests that the Court seal the warrant and accompanying affidavit and application in support thereof, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the USAID OIG, federally deputized state and local law enforcement officers, and other government and contract personnel

acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant. These documents pertain to and discuss an ongoing criminal investigation that is neither known to the public nor known to the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

_____
Joshua Brenner, Special Agent
United States Agency for International
Development – Office of Inspector General

Sworn to before me, this _____ day of February, 2017

_____
THE HONORABLE G. Michael Harvey
UNITED STATES MAGISTRATE JUDGE

9